Mr. Van Buskirk. Good afternoon, your honors. It goes without saying that the courts are already well aware of the facts of the law in this admittedly complicated matter, so I'm just going to try to point out a few critical things that shouldn't be lost in the massive details and hopefully answer any questions you might have. One thing that stands out is that at all phases of this case, to my mind, there's never been any credible legal justification for the basic facts of what the government did here, and I believe that's also going to be the case of today's arguments. We had an 8A, a small disadvantaged contractor, and the work was literally and brazenly stripped away from this person and reassigned, apparently sole source, to a large business. And there was no termination for convenience payment, not one cent was given to this small, essentially almost a sole practitioner, small 8A contractor for two years and ten months. That's half a million dollars that was held for two years and ten months from a small contractor who had lost a $1.4 million contract that was arbitrarily, the work was given to a large business. Mr. Manbuskirk, I don't want to interrupt your summary of the fact, but we really are familiar, we read these briefs very carefully, and I think you're probably best served by focusing on the two issues that are potentially dispositive in the case. The first being the release with respect to the 0004 contract and the question of whether the government had obligations to your client above and beyond the minimums provided in the IDIQ, the two contracts, 47 and 56. Certainly, Your Honor. Those are the two issues that... I'll fast forward directly to that. As regards to the release, I'm essentially looking to, there's a line in Rumsfeld versus Freedom New York. You probably already know I'm going to say this, but it essentially indicates that a breach of the duty of good faith can establish the prong of coercion as far as defeating a release. And I think that even the court below, I do have some factual problems with their decision, but even their decision found that this contract was not administered in the spirit of the 8A program. So they're essentially finding something very close to a breach of the duty of good faith, and it seems that they overlooked that that alone satisfies a coercion requirement. It doesn't have to be a threat made at the negotiating table. But here's my problem with that line of analysis, and that is this, that normally if somebody settles, especially if they settle for a pretty good chunk of change, it is because they have legal problems that they perceive in their position. And that may very well be the case in this case, that the court may have decided we have not handled this very well. Let's just settle it, and we'll have to pay a significant amount of money, half a million dollars, and we'll just walk away from it, and we won't get ourselves involved in litigation that would be lengthy and difficult and frankly embarrassing. But that's what resolutions by settlement are for, is to get rid of problems. Why do you then get to, in effect, double count the problem by saying, number one, the problem resulted in a settlement, and number two, I can then upset the settlement by pointing to the problem? Your Honor, my answer to that, I understand the court doesn't want to open the floodgates here that anyone that feels they were mistreated can now get out of a release. I think what the difference is, is that if IMS had sat down with the Corps of Engineers in 1994 when the work was taken away and come to an agreement and signed a settlement, so be it. They're stuck with it. But what the difference is here is they didn't do that. They held this open for over two years, during which the contractor, I would use the word, was bleeding. He was keeping on staff. Now, why was he keeping on staff? Because in the fall of 1994, and this is not only on his testimony, this is also on Colonel Graves' testimony, they had a meeting and it was strongly indicated to him that work was coming. So he couldn't lay people off. He couldn't wind down operations. He's staying there for two years expecting work with no money, retaining staff, bleeding, and then he comes to the negotiating table. And I would submit, as he testified, and I think it's very believable, he had no realistic possibility of walking away from this settlement and going to trial. So I think it's that, I'll say the word, that bizarre gap of time is what separates this from 99% of cases where they terminate for convenience, they get the notice out within 30 days, it informs the contractor to mitigate his damages, lay off staff if necessary, they put in a settlement, and it all begins moving just as every other termination for convenience case does. So it's that special and very, very damaging span of time during which he was neither terminated nor really having any work. And he actually legally couldn't have wound down because legally he was still under contract 004 and he was expecting, reasonably expecting, a considerable amount of extra work. So I'd say that's the difference was the state he'd been brought to by the time of the negotiations. So it's a very unique situation. But it's a situation of bad faith in that case, is it not? I would say the problem with bad faith is that a lot of the case law on bad faith looks at the subjective malice. It's hard to show. It's difficult to show. At the same time, that's certainly what it sounds as if has to be shown on this theory because it did end in the settlement, as Judge Bryson mentioned. I tend to look at it as being the duty of good faith and cooperation because we can very, without being mind readers, we can very objectively show that there was not cooperation here with him to complete the contract. It was obviously, you can't get further from cooperation than what happened here. So whatever people were thinking in their hearts, the effect was the same as the worst malice imaginable on this contractor. You can't do more to a contractor than both take his work away, not pay him anything, and tell him to maintain staff for two years. So despite what were in people's hearts, the effect was equivalent to actual malice. Well, that would be very difficult to prove. Well, if you, obviously in the trial, there were certainly documents put in where it was referred to IMS versus Malcolm Perny. It was referred to as being a mess. There were documents sent to the SBA claiming that he was being terminated because of change of work. And there's other testimony that the work did not change and his direct work was taken over. And I believe those qualify as sudden fuges, evasions. They were trying to get rid of this guy. That's what it comes down to. And I think that a lot of the bad faith cases you look at, it's an attempt to get rid of someone. Those are the words you see. And that's essentially what happened here. They wanted to get rid of him, and they did get rid of him. But there's no such finding by the trial court on that case. I believe the trial court, they felt that even if it was a failure of the duty of good faith, they did not, my reading of their decision was they didn't feel that that would be sufficient in any case to beat the relief, to beat the release. They do allude to the fact it wasn't administered properly, wasn't administered in the spirit of the 8A program. I'd probably say not just the spirit but the letter. And I think that essentially they didn't feel that, they felt that with the release it didn't particularly matter. There's certainly suggestive language that if that release wasn't there, I think it's suggestive language that they may have felt it fell short of the duty of good faith. Okay. And going on to the other big issue that you mentioned, we have the question of the IDIQ contracts. And once again, it's really a question of whether the duty of good faith and fair dealing applies to those after the minimum's been ordered. It's a very closely related question of whether a contractor's entitled to fair consideration from task orders. Obviously, as I cited, there's been quite a bit of work and discussion on this down at the Armed Services Board level. There's a case of Burke. There's a case of Community Consulting International. And obviously- So how about the Travel Center case of our court, Judge Gaius's opinion? Well, I feel that the Travel Center, it's essentially, the reading that was taken of Travel Center was extremely broad. She quoted Travel Center essentially for the proposition that once the minimum amount has been met, there are no obligations whatsoever from the government to the contractor. And if you look at Travel Center, that was a particular situation. They were given an estimate. And from memory, I can say the estimate said there was a warning that these quantities are estimated and may not be ordered. There was no- Well, here the minimums were exceeded and by multifold, right? Yes, Your Honor. If I could give you the numbers. On contract 0046, those orders were before the controversy. On 0057, between the loss of the fixed price, 004, and the termination, IMS got about $80,000 under that contract, which did exceed the minimums. Obviously, I don't think there's any other case where an IDIQ contract was issued, apparently, or actually not apparently, was issued to make up for the loss of a fixed price contract. And there was testimony from Colonel Graves that this was compensation work. And if you think about that $80,000 at 10% profit, that's $8,000. IMS has lost a $1.4 million contract. It's frankly not a substantial amount of work was issued to them, and that's what brought on the termination, was that Graves ordered this to be done, and you go back and the work just didn't come in. So obviously, I don't think there's any precedent for an IDIQ being tied to basically a breached fixed price contract.  But the consequences of the trial court's interpretation of Travel Center are fantastically broad. When they say no obligations, I take them at their word, meaning that under their interpretation, the government- There being the trial court? Yes, the trial court. Well, the government and the trial court have a very close agreement on this. Well, they may take the same legal position, but they're not the same legal actors. I'm sorry, Your Honor. Yes, the trial court, it could be a situation where the government could phone a contractor, have them buy equipment based on assurances that work's coming, cancel it with no repercussions. It could be that there was a personal animus, they don't like the contractor because he wears a purple turban, no more task orders for him. And under the words of this decision, there would be no recourse that I can see even in that most extreme situation. And it almost makes it an illusory contract. Since the government retains the right to order these products and services at the prices in the contract, yet on the contractor's side, there's not even the trace of any sort of protection, not even the duty of good faith, which has been said to apply to every contract, every government contract, but apparently it would not even apply to these IDIQs once the first $10,000 is ordered. I understand the breadth of what you're suggesting in the IDIQ area. Suppose I'm the government and I have three IDIQ contracts with service providers of one sort or another. Let's just say a limousine service. And I have three of them because I want to make sure I've got a limousine available to take my personnel out to the airport whenever they need. And one of the limousine services, after I've met the minimum with each of them, and one of them just I don't particularly care for the drivers. They seem a little bit unpleasant to some of our guests, etc., etc. So I send more of my work over to the other two. Has the limousine company that didn't get the work, the extra work, have they got any kind of contract claim? Can they come in and get discovery as to whether my dissatisfaction with their work was justified? Under the trial court's interpretation, I believe they would not even be able to proceed to discovery. What do you think is the right rule? I believe the rule, and it actually states in the FARS, that it should have received fair consideration. Fair consideration, but does that impose a duty on the government to come forward in a litigation setting with an explanation that is satisfactory to the contractor or the finder of fact that that was a valid reason for saying I prefer these guys to those guys? When you've met the minimum? I would go so far, yes, personally, to say that the cab, say it's an arbitrary personal dislike. They don't like them. They look foreign. They have an accent, which relevant to this case. Now you're getting to questions of race, national origin, and so forth, which are independently actionable. But if you don't have an independently actionable cause of action, is there any bar to my deciding I really prefer the work I'm getting from Jones to the work I'm getting from Smith? Putting aside the ethnic aspect, just a simple personal animus, a personal dislike, under the trial court's rule, which is basically traditional bad faith, no, there would be no recourse. If the procuring officer simply dislikes someone, I don't see what recourse there is left under this decision. And so that's essentially a license for bad faith, because bad faith is quintessentially a personal animus against a contractor that results in adverse actions. So there would be a green light for that. And I'm quickly burning into my time, Your Honor, so I'll rest here. We'll save your rebuttal time, Mr. Banfuster. Mr. Biggler. Thank you. Thank you, Your Honor. May it please the Court, the trial court correctly granted the government summary judgment on two IDIQ contracts where the government ordered many times the minimum. Moreover, the trial court correctly concluded that with regard to the fixed price contract, the IMS had executed a valid and enforceable release because the government did not make any misrepresentations. IMS knew all the important facts when it entered into and executed the release, and the government did not coerce or threaten IMS to execute the release. What are the obligations of the government under an IDIQ type of a contract besides the minimum requirement? The obligation of the government is to meet the minimum requirement, and once that is done, the obligation is extinguished. But I would point out that here the government continued to give IMS more work and gave them many times the minimum, even though the obligation was extinguished once the minimum was met. Well, does the obligation also run in a duty of good faith under the agreement, to carry it out in good faith? The duty of good faith in fair dealing does apply to IDIQ contracts, but the duty of good faith in fair dealing does not change the express provisions of the contract, and the express provision only requires that the government provide the minimum amount. In your theory, does the duty of good faith apply to the setting of the minimums in the first place? Because one of the arguments here is, of course, that the entire situation, the termination and the restructuring and the substitute contracts with very low minimums, were embroiled in a structure that cannot, or that on its face at least, or from the evidence that was produced in favor of the appellant, does not put the government contracting people in the cleanest light. The government, we don't believe that there's good faith in setting the minimums. The contractor has a choice in entering into the contract, whether it enters into that contract or accepts it or rejects it. It knew what the minimums were. They're clearly stated in the contracts when it entered into. And again, here the government met the minimum many times over. So your theory is that this contractor should have refused those subcontracts, or refused the minimums, entered into litigation at the threshold, and then hoped somewhere several years down the road he might receive some sort of convenience payment? No, it's not our position that he should have rejected them, but he obviously accepted them, and that's what any contractor does when they accept an IDIQ contract. They understand that their only guarantee is the minimum. If that's not acceptable to them, then they shouldn't enter into the contract. So your position is that the argument that there was some sort of duress, whether it was economic duress or inadequate information, is irrelevant to the entire situation, including, I go back to the requirement of good faith and fair dealing? For the IDIQ contracts, I don't believe that that is IMS's argument that they entered into those IDIQ contracts under a duress. It's my understanding that their argument is that duress goes to whether or not the release of Contract 4 is valid and enforceable. Well, it was all part of one structure, isn't it? They didn't get any business under the IDIQ contracts, although, at least according to the record, more had been promised, or they may have expected that more had been promised than what they obtained. It's true, they apparently expected, and Mr. Singh testified, the president of IMS testified, that he believed he would get more, but there was never a promise made. And the trial court found in its opinion that no promise was made to them that they would get any additional work. And Colonel Graves testified to that. And even IMS's president, the IMS relies upon a meeting that occurred with Colonel Graves in November of 1994, November 22nd. And after that meeting, Mr. Singh sent a letter to Colonel Graves confirming the meeting and stating that IMS anticipates a resolution for this matter that is agreeable to all parties involved, which clearly implies that no agreement or promise had been made at that time or at that meeting. And what do you base that implication? That is based upon Mr. Singh's letter, which is in the record, page 1059 and 1060. He says he trusts it will work out. Had he been given the amount of business that I think, according to the record, was undisputed, was discussed, then certainly that would have happened. I'm not sure I followed your question. I'm sorry, Your Honor. Well, I think that you say that he accepted that things might not work out because he accepted the low minimum? True, under an IDIQ contract, the contractor accepts that the minimum may be all that they will get. Despite the circumstances, this is not a simple relationship that has been presented to us. I understand, Your Honor, but with regard to the Contract 46, he had already entered into that contract before he even had this meeting with Colonel Graves. The Contract 57 was not entered in until later, but the earlier contract he had already accepted long before there was any problems that they're now claiming. Yes, and how does that relate to the issue that's now before us? I think the fact that Contract 46 was entered into prior to any of this shows that he obviously accepted that that was a fair contract that he thought was in his best interest and took it and knew that the minimum was only $100,000 and it was not the result of any duress or anything improper from the government. And so what is the government's response to the undisputed evidence and the recorded evidence of the internal government concerns about the termination of this relationship? Yes, Your Honor, there are certainly internal deliberations within the government as to what the proper course of action would be and whether it was proper to do a termination for default or termination for convenience and ultimately the government executed a termination for convenience. I think the main thing that IMS is complaining about here is the fact that the termination for convenience took so long. But the reason that it took so long was that when initially in 1994 Colonel Graves informed IMS that they would not be allowed to complete this work and that this work would be completed by Malcolm Kearney, at that point they knew they were not going to be able to complete this work and rather than being terminated for convenience, they asked the government to not terminate and to try and find other work and modify contract 4 to give them other work. Because they were a small business, the government attempted to honor that request or go back and see if they could honor the request and ultimately the government decided that they could not do that, that there was no way that they could do that and so they did not and ultimately then in March of 1996, they sent out a letter terminating the contract for convenience and then the IMS submitted a settlement proposal and they entered into settlement negotiations and ultimately settled their differences with respect to contract 4. And so the government's position is that explains the two years of no payment? Yes, Your Honor. There's one other thing, one other reason why they weren't paid and why IMS was not paid and that was that they had gone forward and continued working even though their work plan was not approved. Because their work plan was not approved, IMS could not bill for that work and IMS's president admitted that or testified to that during the trial that they had gone forward and done work without an approved work plan and as a result they couldn't bill for it and if they couldn't bill for it, they didn't get paid and that's another reason why there was this gap or this time period that went by when they were not paid. Yes, it's very strange indeed. It wasn't terminated. They say, apparently without dispute, that they were obliged to remain ready to perform and that since it hadn't been terminated, they felt that whatever it was, some minimal performance, the record before us as it is clear, or as full as it was before the trial court and meanwhile in incurring costs, having confidence perhaps in their status as a small business and not having been charged with default of any sort, there is something very curious about all of this, heartless in some ways in terms of government dealings with contractors who are willing to bring their resources to bear. Yes, Your Honor. I would like to address what you mentioned about them holding the worker or needing to keep the workers ready for the contract. They were told by Colonel Graves in November 1994 that they would not be completing this work and their settlement proposal shows that they did not keep workers on for the purposes of completing contract four for more than a few months. They did not keep them on for that entire time. Well then, what was the reason for the two-year delay in payment? Again, the reason was that the Corps was trying to find other work for them and then determined that they could not do a modification and give them other work, and the other reason that I mentioned was . . . I didn't see that in the record, that they were trying to find other work for them? It looked as if they turned the project over to the alternative contractor. Colonel Graves testified to that, that he was trying to find other work for them, although he was not obligated to do so, and I believe his testimony was that this small business program exists to give business to small businesses, and they felt since this work was being taken away from IMS and given to a large business, that they would try to find other work for them. Was there an effort made, I seem to recall in the opinions and discussion, an effort that was made to get Malcolm Purney to take on IMS as a sub? Yes, Your Honor, that's true. But IMS decided not to accept that? That's true, Your Honor. And that was initiated by Colonel Graves? I believe that was initiated by the contracting officer, Mr. Riles. Right. And the idea behind that was that Malcolm Purney would mentor them and that it would be a learning experience for them, but IMS rejected that. Okay. Any more questions? Any more questions? Okay. Thank you. Thank you, Your Honor. Thank you, Mr. Baker. Mr. Van Busker? Very briefly, I just wanted to go to the specific testimony of Mr. Graves regarding the meeting in November of 1994. It's quite pivotal. There was a question from Mr. Camargo of the trial counsel. You were trying to fill the gap then, weren't you? I mean, if they lost this work, somehow you were trying to fill this gap for the lost work, correct? And Lieutenant Colonel Graves responded, I wouldn't use that word to describe it. The installation didn't want IMS to do this work. We were in a program where we were trying to provide work, in question. Well, it would have been a blow to them if they lost the work, right? He says that's true. Okay, and you were looking for other work to soften that blow or fill a gap, weren't you? And Colonel Graves says yes. Were they trying to live up to the spirit of the law in Section 8A? At least trying to find additional work for them? Well, as far as trying goes, that actually brings me to the other thing I wanted to point out to the Court is, I believe it's Appendix 591 to 592, that they spoke to Contracting Officer Kathy Robinson because of the trial. There was an effort made to find out if anyone – Was it Robinson or Riles or were they sequestered? I'm speaking of Robinson right now. Were they both of those people as Contracting Officer at different times? My understanding is that Riles was the terminating Contracting Officer. Before the termination, Robinson was, I would call, the administering Contracting Officer. And she flat out stated it was not her job to look for work for IMS and stated that she did nothing to look for work for IMS. So it's no mystery why they didn't get any work. The Contracting Officer admitted that she made no effort to find work. Riles did. Graves sent a note to Contracting, I believe, and what the note said was, as I understand it, our course of action is, one, to seek entering an IDTC with IMS, two, to use the remaining capacity in the Water Volite contract, that would be 004, to do work elsewhere in New York, parentheses, as opposed to T for C. But that was never implemented in contracting, apparently. When she indicated she hadn't really – Robinson indicated she hadn't really looked for work for IMS. And that somewhat resolves the mystery of why the work didn't arrive because no one looked for it. No one issued it. It just didn't happen for two years. But there was an attempt by the government to have the contractor take over and have IMS as a subcontractor. Yes, there absolutely was. And IMS, frankly, refused that. They felt this was their contract, this was their big break, and they weren't going to play second fiddle. And also there was some testimony from their – because this actually is a tripartite contract with the SBA, essentially as a silent partner. And there was testimony from James Branch, who was IMS's SBA liaison, that he supported them in not taking that. And he said there was a pervasive problem during this time period with these small minority businesses being used as figureheads by large corporations. So IMS apparently had SBA support, and the SBA actually looked – did not look favorably on them being supplanted and brought in as a figurehead subcontractor. Well, there would have been a subcontractor not under the 8A set-aside. No, it would not have been 8A. It would have been a subcontract from a major company. It would have been a commercial subcontract, essentially. It would have helped Malcolm Kearney because then they're meeting their requirements for subcontracting to small and disadvantaged businesses. It may have also helped IMS. At the same time, they would have really entirely been waiving their rights and giving up and putting up the white flag. So obviously in retrospect, maybe it would have supplied them with some funding, but they would have lost. At that time, they were still trying to save this contract. In November, October 1994, they went in to meet with Graves. My understanding, essentially, IMS was still trying to save the 004 work. They didn't want the termination for convenience. Oh, no, they wanted to do the work. And when they weren't allowed to do the work, they desperately didn't want the termination for convenience. I understand, but to say that on the one hand, the government shouldn't have hesitated as long as they did before terminating the contract, on the other hand, that they should, you know, that IMS was interested in having them hold off for as long as they could. What they did was the worst possible thing because they neither terminated and just, you know, settled it by a termination and gave them their money, nor did they actually give them work elsewhere in New York, as Graves said. So IMS, they wanted the work, but doing neither was worse than doing either option. It would have been better to terminate them flat out in 1994 or actually give them work. Doing neither of the two things could cause the maximum possible loss to IMS. Was there a question as to the quality of the work that IMS was doing at that time so that the supervisory aspect of the new contractor could have helped them in getting some of their work done? May I answer your question, Your Honor? Time's up. As we looked at the trial record, the trial testimony, other than an audit report that was done in 1997 that had some anecdotes, basically unattributed statements that there was a problem, there was not testimony from any of the witnesses that said they were doing the work wrong. The closest it came was James Sherman, and he actually mentioned that the plan they put in was too thorough and would make it more likely that Water Volite would be caught by the EPA because IMS wanted to put in more groundwater wells. Thank you, Your Honor. Any more questions?  Thank you, Mr. Van Buskirk and Mr. Bigelow. The case is taken under submission.